No. 19-70019

IN THE

# United States Court of Appeals for the Fifth Circuit

GARY GREEN,

*Petitioner–Appellant,*

v.

LORIE DAVIS, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

*Respondent–Appellee.*

On Appeal from the United States District Court for the
Northern District of Texas, Dallas Division, No.3:15-cv-2197

## RESPONSE IN OPPOSITION TO APPLICATION
## FOR CERTIFICATE OF APPEALABILITY

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

MARK PENLEY
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

ELLEN STEWART-KLEIN
Assistant Attorney General
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
ellen.stewart-
klein@oag.texas.gov

*Counsel for Respondent–Appellee*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Respondent–Appellee*
> Lorie Davis, Director
> TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL
> INSTITUTIONS DIVISION

*Counsel for Respondent–Appellee*
> Ellen Stewart-Klein, Assistant Attorney General
> OFFICE OF THE ATTORNEY GENERAL OF TEXAS

*Petitioner–Appellant*
> Gary Green

*Counsel for Petitioner–Appellant*
> Michael Mowla
> P.O. Box 868
> Cedar Hill, Texas 75106

> s/ Ellen Stewart-Klein
> ELLEN STEWART-KLEIN
> Assistant Attorney General
> *Counsel of Record*
> *Counsel for Respondent–Appellee*

## STATEMENT REGARDING ORAL ARGUMENT

The parties' briefs adequately lay out the facts and legal arguments, and the decisional process would not be significantly aided by oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................... iii

TABLE OF CONTENTS ........................................................... iv

TABLE OF AUTHORITIES .................................................... vi

INTRODUCTION ................................................................... 1

STATEMENT OF THE ISSUES ................................................ 1

STATEMENT OF THE CASE ................................................... 2

   I.  Facts of the Crime ...................................................... 2

   II. Punishment Phase Evidence ......................................... 7

     A.   The State's Case ................................................. 7

     B.   Evidence presented by the defense .......................... 10

   III. Course of State and Federal Proceedings ...................... 14

SUMMARY OF THE ARGUMENT ......................................... 15

ARGUMENT ...................................................................... 16

   I.  The Standard of Review ............................................. 16

   II. Green Is Not Entitled to a COA On His Claim of Alleged Intellectual Disability nor His Related Ineffective  Assistance of Trial Counsel Claim. (Claim 1) ..................................... 18

   III. Green Is Not Entitled to a COA On His Claim That His Personal Mental Health Characteristics and Circumstances Exempt Him from Execution Under *Atkins*. (Claim 2) ...................... 27

IV. Green Is Not Entitled to a COA On His Shackling Claim  Because He Has Not and Cannot Prove Any Juror Saw Him  in Shackles. He Is Also Not Entitled to a COA on His Related  IATC Claim. (Claim 3) ................................................................................29

V. Green Is Not Entitled to a COA On His IATC Claims Regarding Counsel's Alleged Failures to Investigate, Develop and Litigate Issues of Green's Diminished Capacity and Abandonment Rage. (Claim 4) ...................................................................................35

    A.   Green's IATC claims regarding the guilt-innocence    phase. .36

    B.   Green's IATC claims regarding the punishment    phase. ......38

VI. The Lower Court Did Not Err in Denying Green's Various Funding Motions. (Claim 5) ..........................................................................40

CONCLUSION ........................................................................................49

CERTIFICATE OF SERVICE ...............................................................51

CERTIFICATE OF COMPLIANCE ......................................................52

ELECTRONIC CASE FILING CERTIFICATIONS ..............................52

# TABLE OF AUTHORITIES

## Cases

*Aguilar-Ayala v. Ruiz*, 972 F.2d 411 (5th Cir. 1992) ............................ 43

*Atkins v. Virginia*, 536 U. S. 304 (2002) ....................................... passim

*Ayestas v. Stephens*, 817 F.3d 888 (5th Cir. 2016) .................... 42-43, 46

*Black v. Collins*, 962 F.2d 394 (5th Cir. 1992) ................................... 26

*Carty v. Thaler*, 583 F.3d 244 (5th Cir. 2009) ................................... 46

*Crutsinger v. Stephens*, 576 F. App'x 422 (5th Cir. 2014) .................... 49

*Cullen v. Pinholster*, 563 U.S. 170 (2011) .......................... 17, 36, 44, 47

*Devoe v. Davis*, 717 F. App'x 419 (5th Cir. 2018) ................................ 45

*Dorsey v. Stephens*, 720 F.3d 309 (5th Cir. 2013) ............................... 18

*Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000) ............................. 46

*Harbison v. Bell*, 556 U.S. 180 (2009) ............................................. 42

*Hardy v. Cross*, 132 S. Ct. 490 (2011) ............................................. 17

*Harrington v. Richter*, 562 U.S. 86 (2011) .............................. 18, 21, 23

*Hill v. Johnson*, 210 F.3d 481 (2000) .............................................. 41

*In re Neville*, 440 F.3d 220 (5th Cir. 2006) ......................................... 28

*Jones v. Davis*, 927 F.3d 365 (5th Cir. 2019) ..................................... 45

*Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992) ........................................ 47

*Knowles v. Mirzayance*, 556 U.S. 111 (2009) ........................................ 26

*Langley v. Prince*, 890 F.3d 504 (5th Cir. 2018) ................................... 21

*Livingston v. Johnson*, 107 F.3d 297 (5th Cir. 1997) ............................ 47

*Loyd v. Whitley*, 977 F.2d 149 (5th Cir. 1992) ..................................... 25

*Martinez v. Ryan*, 132 S. Ct. 1309 (2012) ..................................... passim

*Mays v. Stephens*, 757 F.3d 211 (5th Cir. 2014) ................................... 28

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ....................................... 16-17

*Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) ..................................... 21

*Parker v. Matthews*, 567 U.S. 37 (2012) ............................................. 23

*Picard v. Connor*, 404 U.S. 270 (1971) ............................................... 47

*Rice v. Collins*, 546 U.S. 333 (2006) .................................................. 32

*Rockwell v. Davis*, 853 F.3d 758 (5th Cir. 2017) ................................. 28

*Roper v. Simmons*, 543 U.S. 551 (2005) .............................................. 28

*Schriro v. Landrigan*, 550 U.S. 465 (2007) ......................................... 32

*Segundo v. Davis*, 831 F.3d 345 (5th Cir. 2016) ................................... 27

*Slack v. McDaniel*, 529 U.S. 473 (2000) .............................................. 17

*Smith v. Davis*, 927 F.3d 313 (5th Cir. 2019) ...................................... 28

*Sones v. Hargett*, 61 F.3d 410 (5th Cir. 1995) ..................................... 34

*Sterling v. Scott*, 57 F.3d 451 (5th Cir. 1995) ...................................... 41

*Strickland v. Washington*, 466 U.S. 668 (1984).......................... 25-26, 38

*Thomas v. Vannoy*, 893 F.3d 561 (5th Cir. 2018) ...................................22

*Trevino v. Thaler*, 133 S. Ct. 1911 (2013) ................................... 33, 46-48

*Turner v. Johnson*, 106 F.3d 1178 (5th Cir. 1997) .............................. 47

*United States v. Ebron*, 683 F.3d 105 (5th Cir. 2012) .......................... 43

*Wetzel v. Lambert*, 565 U.S. 520 (2012) ................................................. 23

*Wilson v. Sellers*, 138 S.Ct. 1188 (2018) ....................................... passim

*Woodward v. Epps*, 580 F.3d 318 (5th Cir. 2009) ................................. 42

## Statutes

28 U.S.C. § 2253 .................................................................... 16

28 U.S.C. § 2254 ............................................................... passim

28 U.S.C. § 3599 ............................................................... passim

# INTRODUCTION

This is a federal habeas corpus appeal brought by Petitioner-Appellant, Gary Green, a death-sentenced Texas inmate. Green seeks a certificate of appealability (COA) from the lower court's denial of federal habeas relief. Green also claims that the lower court abused its discretion in denying his multiple motions for funding. But, as shown below, the lower court acted according to established law and did not err. A COA should be denied.

# STATEMENT OF THE ISSUES

Green seeks a COA on the following claims:

1.  Green argues he is intellectually disabled so his sentence of death violates clearly established law. He also argues trial counsel was ineffective for failing to investigate and litigate this issue.

2.  Considering Green's personal characteristics and circumstances, his execution violates the Eighth Amendment.

3.  Green alleges that jurors saw him in shackles without a finding of necessity by the trial court which violates his Fifth and Fourteenth Amendment rights. In the alternative, trial counsel was ineffective for failing to object to the shackles.

4.  Trial counsel was ineffective for failing to investigate Green's diminished capacity and abandonment rage.

5.  The lower court erred in denying Green's numerous motions for funding.

# STATEMENT OF THE CASE

## I.    Facts of the Crime

The Texas Court of Criminal Appeals summarized the facts of

Green's crime as follows:

> [Green's] conviction for capital murder is supported by his own confession. In it, he explained that the week before the offense, he had discovered that [his wife] Lovetta was going behind his back to get their marriage annulled. On the day of the offense, September 21, 2009, Lovetta wrote two letters to [Green], telling him that it was time for them to part ways and that he needed to move out. [Green] felt betrayed by his wife's actions and wrote his own letter in response, detailing his plan to take five lives that night including his own. While Lovetta was reading the letter in the master bedroom, [Green] took knives from the kitchen and went into Jazzmen's[1] bedroom, where he tied her up and put duct tape over her mouth. He then brought Jazzmen into the master bedroom and laid her on the end of the bed. [Green] proceeded to struggle with Lovetta for about an hour and a half, stabbing her more than twenty-five times. Once Lovetta was dead, [Green] took Jazzmen into the bathroom, filled the bathtub, and held Jazzmen under the water until she died. He stated that Jazzmen struggled so much that he had to turn his head away. He pulled her from the tub and laid her face down onto the floor. Then he took a shower, changed into dress clothes, and went to pick up Lovetta's two sons, Jerome ("J.T.") and Jerrett, from their regular church program.

> [Green's] confession was corroborated by physical evidence and by witness testimony, including that of J.T. and Jerrett, who were twelve and ten years old at the time of the

---

[1]    Jazzmen Armstead was Lovetta's six-year-old daughter who Green was convicted of killing in the same criminal transaction as his wife, Lovetta. ROA.4583.

offense. According to their testimony, J.T. and Jerrett attended their regular church program that evening, and [Green] picked them up when the program was over. They testified that they were surprised to see him because usually their mother picked them up. J.T. also noticed that [Green] was wearing all black. When they arrived home, [Green] told J.T. to take a shower and instructed Jerrett to put on his pajamas for bed. [Green] then called Jerrett into the kitchen to discuss issues Jerrett was having in school. As Jerrett was explaining the problems, [Green] grabbed a knife held it to Jerrett's throat, and dragged him toward the bathroom. J.T. was still in the bathroom, and he heard his brother calling for help and yelling that [Green] was "going to kill him." J.T. stood at the bathroom door and saw [Green] holding Jerrett by his collar. [Green] threw Jerrett into the bathroom with J.T., came in himself, and locked the door. [Green] then sat on the bathroom counter with three knives beside him and asked the two boys why he should not kill them.

As Jerrett began to plead for their lives, saying they were too little to die and that they would not tell anyone about what had happened, [Green] stabbed him in the stomach. J.T. tried to push [Green] off of Jerrett, but missed. [Green] then told the boys that he was not going to kill them and told J.T. to get dressed because [Green] had something to show them. As they were about to leave the bathroom, [Green] suddenly put the knife up to Jerrett's throat and tried to "screw it in" but Jerrett ducked away and backed up towards the toilet. [Green] paused and then said: "All right. Come on." [Green] led the boys into their mother's room, and when they saw their mother's body, they fell to their knees crying. [Green] explained to J.T. and Jerrett that he had to kill their mother because she wanted to divorce him and he "loved her to death" and did not want her to leave him. The boys also saw their sister's body in the bathroom. [Green] changed clothes and told J.T. to hand him some pills that were on the dresser in the bathroom. [Green] then threw a cell phone on the bed and instructed the boys to call 911 after he had left. J.T. recalled

that [Green] said he was going to kill himself. [Green] made the boys give him a hug before he left.

After [Green] fled the apartment, the boys called 911 and ran to the home of their neighbor, Latasha Bradfield. According to Bradfield's testimony, Jerrett was holding his stomach, and both boys were screaming that [Green] had killed their mother and sister. Bradfield took the phone from Jerrett's hand and spoke with the 911 operator. She then went next door and verified that Lovetta was lying on the floor of the bedroom and that she was not breathing.

Officer James Jones and his partner Officer Alder responded to the 911 call. Officer Jones went into the master bedroom and found Lovetta lying in front of the bathroom door and Jazzmen in the bathroom. The bathroom was covered in blood. Detective Jason Gindratt and Detective Will Vick were also called to the house on the evening of the offense. During their inspection of the crime scene, they noticed that four knives appeared to be missing from the knife block in the kitchen. The knives were later found under the microwave, on the kitchen counter, and under a cushion on the couch. The detectives also found handwritten letters in the middle of the bed in the master bedroom. Lovetta's mother, Margarita Brooks, identified the handwriting as Lovetta's and [Green's]. In Lovetta's letter, she wrote that it was time for her and [Green] to part and that [Green] needed to move out. In [Green's] letter, he expressed his anger toward Lovetta for kicking him out and laid out his plan to murder the entire family. [Green's] letter stated, "You asked to see the monster, so here he is, the monster you made me. Bitch. There will be five lives taken today, me being the 5th."

Around 215 a.m., hours after the murders took place [Green], his mother, and his brother all went to a police substation. Officer Troy Smith testified that [Green's] mother told him that her son might have been involved in a murder. After Officer Smith confirmed that there had been a double homicide, he placed [Green] under arrest.

Homicide Detective Robert Quirk and his partner, Detective Ahearn, were called to the scene of the murders. Upon arriving, they learned that there were witnesses and that a suspect had been identified. After hearing that [Green] had surrendered, they headed to the police station to meet him and conduct an interview. Detective Quirk read [Green] his *Miranda* rights, which [Green] agreed to waive, and then [Green] confessed. [Green] also told the detectives where to find the letters, as well as Lovetta's car, in which he had fled on the night of the murders. When Lovetta's car was searched, a soda can and a nearly empty blister pack of Benadryl, both containing [Green's] fingerprints, were found on the floorboard. Quirk testified that about 26 of the 28 pills were gone from the Benadryl blister pack.

During the interview with Detective Quirk, [Green] was cooperative and answered every question asked of him. [Green] told Quirk that he had a history of mental illness and that he had been in a mental hospital, Timberlawn, one month before the offense. [Green] told Quirk that he thought Lovetta and her children were plotting against him and that he heard voices telling him to commit the murders. [Green] said he took the pills to kill himself so that the family would be back together in heaven. Quirk testified that [Green] seemed dejected and somewhat remorseful.

Forensic evidence was provided by Angela Fitzwater, a forensic biologist, who analyzed fingernail clippings taken from Lovetta. Fitzwater compared the DNA profile taken from the clippings with the known DNA profile taken from a buccal swab from [Green]. She testified that the clippings from the right hand showed two contributors, Lovetta and [Green], and that the clippings from the left hand showed the DNA profile of [Green], which matched in nine areas. She also testified that a sperm-cell fraction obtained from a vaginal swab taken from Lovetta during the autopsy showed [Green] to be the major contributor. Fitzwater was unable to quantify the

amount of time that had elapsed between the intercourse and death, but she thought that it was recent.

Jill Urban, the medical examiner who performed Lovetta's autopsy, classified the manner of death as a homicide. Urban testified that Lovetta had suffered more than twenty-five stab wounds, including one in the right back that had punctured the right lung and one on the back of the left thigh that was eight inches deep. There were stab wounds on Lovetta's elbow and right hand, as well as clusters of stab wounds in the right upper quadrant of her abdomen, on the back of her neck, and on her upper back. The wounds were all consistent with [Green's] confession.

Meredith Lann performed the autopsy on Jazzmen and also ruled the manner of death to be a homicide. Lann testified that there was a hemorrhage on the very top of Jazzmen's head and that her eyes contained small burst blood vessels, also known as petechia. Jazzmen's lungs showed pulmonary edema, which Lann explained is the body's reaction to hypoxia, or a low state of oxygen. When examining Jazzmen's face more closely, Lann noticed a small amount of adhesive residue in an L-shape on the left cheek, which was consistent with [Green's] statement that he had placed duct tape over Jazzmen's mouth. There was evidence that Jazzmen's hands and ankles had been bound with duct tape as well. Lann testified that [Green's] confession to drowning Jazzmen was consistent with those findings. The defense presented no evidence during the guilt phase of trial.

ROA.4583-4588; *Green v. State*, No. AP-76,458 slip op. at 2-6 (Tex.

Crim. App. Oct. 3, 2012).

## II.    Punishment Phase Evidence

### A.    The State's Case

Jennifer Alcorn Wheeler dated Green for a period of approximately two years when the two attended different high schools in the late 1980's. ROA.7020 (31-33).[2] Wheeler broke up with Green in May of 1989. ROA.7022 (37). In July, Green was caught with thirteen wrapped bags of cocaine. ROA.7018-20 (24-29). In August, Green was standing at a bus stop near Wheeler's house at around five in the morning and asked her for a ride to his house, which she granted. ROA.7022 (38). When they arrived at Green's house, Green removed a set of shoelaces from his boots, forced her into the passenger seat, and drove her to Crawford Park. *Id.* (39). At Crawford Park, Wheeler begged Green not to kill her, telling him that he loved her. *Id.* (40). Green choked her with the shoelaces, and she lost consciousness. *Id.* She awoke at a hospital with a stab wound to the chest, a missing tooth, black eyes, a swollen jaw and chest, and ligature marks around her neck. *Id.* She remained hospitalized for about a week. ROA.7022-23 (40-41). Green told Wheeler's family that she was robbed

---

[2]    The Reporter's Record found in the ROA contains four pages per ROA cite. For the Court's convenience, the Director has included the page citations in from the Reporter's Record in parentheticals.

and came to his house, but eventually pled guilty to aggravated assault. *Id*. (41).

Joseph Johnson was the store manager of County Fair Foods in April of 1990. ROA.7034 (85-86). Johnson's store was robbed. ROA.7035 (91). Two customers and a cashier were in the store, and Johnson was in his office, when he heard a "pop," which he thought was the popping of a balloon hung up for display until he heard a second "pop." *Id*. Two men in ski masks appeared holding firearms, one a shotgun and the other a pistol, one of whom approached the office and tried to insert his pistol through the "scoop." ROA. 7035-36 (91-93). They fired their weapons into the air, and Johnson flung himself to the floor. ROA.7036 (93). The man with the pistol shot into the doorknob of the office three or four times, stepped over Johnson, opened the cash register, stole money from it, and left. *Id*. (96-97). A month later, Green confessed to the robbery of Johnson's store. ROA.7030 (72).

Shulonda Ransom met Green when she was working at a photo lab in Walmart in late 2000. ROA.7043 (123). They became romantically involved almost immediately. *Id*. (124). The physical abuse started to occur when Ransom was five months pregnant with Gary, Jr., and the

two were living together. ROA.7044 (125). Green slapped Ransom in an argument over money. *Id.* (125-26). Green's mother and father, present at the time, made the couple split up for a period of two months. *Id.* (126). Green and Ransom resumed living together, and the abuse continued. *Id.* at 127. Every time Green would hit or choke Ransom, he would seem apologetic and swear he would never do it again. *Id.* Yet the chokings continued, even after it was discovered that Ransom was pregnant with the couple's second child. *Id.* Anything could provoke him, from not cooking the right way to not cleaning the right way. *Id.* (128). The final incident occurred over a dispute where Ransom wanted to return to work. *Id.* Ransom sought refuge in the bathroom, but Green grabbed her by the throat, lifted her up, put her over the sink, and choked her until she passed out. *Id.* Ransom awoke, stayed the night with her sister, went to work the next day, and returned to the apartment to find that Green had removed everything from the apartment – every article of clothing, every item of furniture, every spoon and diaper – leaving the apartment as if it were new. ROA.7045 (129-30).

**B.    Evidence presented by the defense**

There was testimony concerning the prevalence of mental illness in Green's family. Shirely Coleman, Green's aunt, claimed that Green's grandmother, Bertha Curry, would have bouts of hysteria, like false pregnancies, and she was on medication for mental illness. ROA.7094 (10-12). Bertha Curry claimed there are many people in her family with mental health problems, though no one wants to admit it. ROA.7134 (170). Her daughter, Deborah, now dead, was admitted to a psychiatric health hospital. ROA.7135 (173). A stepson killed himself and his wife. *Id.* (174). Mary Sampson, Green's mother, testified that, though she herself had never had problems with her mental health save for a bout of nervousness when she was pregnant with Green's brother, Nysasno, some of her siblings had mental issues. ROA.7116 (98-100). Mary's grandchild, Green's daughter La Jay, was seven years old and similarly isolated herself the way Green used to. ROA.7119-20 (112-13).

Thomas Carter, Green and Nysasno's father, was out of the house by the time Green was three and a half years old. ROA.7126 (138). He was abusive towards Mary, and Green was sometimes a witness to the

violence. ROA.7117 (101-03). Thomas also was abusive towards Green. *Id*. (103).

Mary testified that she was always there for Green when he was a child, and that someone was always in the house when her children were young. ROA.7126 (140). Coleman, however, testified that Mary was not as attentive to her children's behavior as she could have been, especially as illustrated in an incident when Nysasno and Green were children. ROA.7095 (13). Nysasno brought home a car that he claimed was a gift, but the busted keyhole and steering column made it obvious the car was stolen, and Mary was oblivious to this fact. *Id.* (13-14). Mary claimed she was under the impression that Green made average grades and did not believe he was in need of special education help. ROA.7119 (110-11). Nysasno testified that Green did not do well in school, and he did not know if Mary was aware of it. ROA.7188 (133). He expressed concerns about Green more generally to his mother, but she "brushed it off." *Id*. Mary claimed she was not aware of any possible mental health issues or disabilities when Green was young, and Green has never told her that he was sexually abused. ROA.7127 (141).

Dr. Kelly Gray-Smith, a psychologist who specializes in school psychology, testified that because of cultural factors and the stigma associated with mental illness, members of the African-American community are less willing to seek out help for individuals with mental illness. ROA.7142 (204), 7144 (209-10). Based solely upon her examination of Green's old school records, his consistently low academic performance was such that she would have recommended Green be examined for special education. ROA.7147 (223-24). Green did in fact achieve a normal level of academic success in the ninth grade, when he was on the football team. *Id.* (222).

Multiple witnesses testified to strange behavior by Green when he was a child. In one incident in junior high school, Green attempted to jump off the roof of a neighboring elementary school and was coaxed out of it. ROA.7118 (108). Green seemed to have a sort of paranoid attitude, unwilling to sit with his back to the door. ROA.7119 (111). On one occasion, Green was convinced that someone had entered the house while he was taking a shower and Mary and her husband were away, though the absence of damage to the house's burglar bars made that unlikely. *Id.* (111-12). On another occasion, Bertha observed Green as he went to a

nest of snakes near a wire fence on their property, grabbed a fairly large snake, bit its head off, and wanted to present it to his mother. ROA.7133 (167).

Green also engaged in less savory behavior. Nysasno and Green as children had two dogs named Cain and White. ROA.7179 (97), 7191 (147). Green and a friend named Marcus lit the two dogs on fire. *Id.* Green also began smoking marijuana at age twelve and was recorded as having truancy issues. ROA.7179 (98).

Dr. Gilbert Martinez was called to present the results of clinical psychological and neurological examinations on Green. ROA.7083-84 (128-31). Dr. Martinez conducted an examination on Green on May 25, 2010, consisting of two hours of interviewing and five hours of testing. Dr. Martinez opined that Green has schizoaffective disorder. ROA.7085-86 (136-40). Green has a depressive mood, and symptoms of several personality disorders, though he has no specific personality disorders. ROA.7085 (137-38). Green does not have anti-social personality disorder, and he is not schizophrenic. *Id.* (140). Green is not mentally retarded – he tested a full range IQ of 78, with verbal and perceptive scores of 81 and 84, respectively. *Id.*

Green was despondent and depressed when Martinez met him in jail, something Martinez expected in a person charged with a capital crime. ROA.7158-59 (16-17). Green was within the range of acceptability when administered tests to determine if he was accurately representing his cognitive abilities. ROA.7159 (18-19). The cognitive tests were designed to test the memory, attention, and reasoning skills of the subject. *Id.* (20). Green's full range IQ of 78 places him the higher end of the "borderline" range. ROA.7160 (22). Green did not have severe problems with memory, but had problems with attention, and his lower capacity for attention seemed to reduce his overall score, as the results of some tests were in the normal or just below normal range. *Id.* (22-24).

## III.  Course of State and Federal Proceedings

Green was convicted of capital murder for killing his wife Lovetta Armstead, and Lovetta's six-year-old daughter, Jazzmen Armstead. ROA.4582-4655; *Green v. State*, No. AP-76,458 slip op. (Tex. Crim. App. Oct. 3, 2012). Green appealed to the Texas Court of Criminal Appeals (CCA) which affirmed his conviction. *Id*. The Supreme Court denied Green's petition for a writ of certiorari off direct appeal. *Green v. State*, 133 S. Ct. 2766 (2013). Green also filed a state habeas petition which the

CCA denied. ROA.10672-673; *Ex parte Green*, No. WR-81,575-01 (Tex. Crim. App. 2015). Green petitioned the lower court for federal habeas relief. But the lower court denied Green's motions for funding, his federal habeas petition and denied him a COA. ROA.449-456, 4327-4325, 4354-4415.

## SUMMARY OF THE ARGUMENT

Green raises four grounds for COA and asks this Court to review the lower court's multiple refusals to grant him funding. But Green fails to demonstrate that the lower court erred or that jurists of reason would debate the lower court's denial of relief. Green fails to demonstrate that he is intellectually disabled which is also fatal to his related claim of ineffective assistance of trial counsel (IATC). Green has no law that supports the extension of *Atkins v. Virginia*, 536 U. S. 304 (2002), to claims of mental illness generally or as applied to him. Green's shackling claim was raised and rejected in the state courts after a hearing in which the habeas court specifically found the juror's testimony of seeing shackles incredible. Green has failed to provide clear and convincing evidence to overcome that credibility determination. He also fails to prove the merits or even the debatability of his related IATC claim. And despite

Green's arguments to the contrary, the lower court found that state habeas counsel had raised IATC claims regarding failure to investigate and present evidence. Thus, the lower court gave proper deference to the state court's findings but also considered Green's evidence in its entirety and still denied relief. Green again fails to show this denial is debatable. Finally, Greens fails to show the lower court abused its discretion in denying his extensive funding requests. For these reasons, a COA should be denied and the judgment of the lower court should be affirmed.

## ARGUMENT

### I.    The Standard of Review

A COA is necessary to appeal the denial of federal habeas relief, § 2253(c)(1), and the requirement is jurisdictional. *Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003). For claims denied on the merits, an inmate must make "a substantial showing of the denial of a constitutional right," § 2253(c)(2), which requires that "reasonable jurists could debate whether (or, for that matter, agree that)" the court below should have resolved the claims in a different manner, or that the claims "deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336. For claims disposed of on procedural grounds the inmate must show "that jurists of

reason would find it debatable whether the petition states a valid claim of a denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

When an inmate seeks a COA on a claim denied on the merits by a state court, it must be reviewed in light of § 2254(d). *Miller-El*, 537 U.S. at 341. This section, as amended by the Antiterrorism Effective Death Penalty Act (AEDPA), "imposes a highly deferential standard of review for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam) (internal quotation marks omitted). Review is "limited to the record that was before the state court" and "focuses on what a state court knew and did." *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011).

Under § 2254(d), a federal court may not grant habeas relief unless the state-court adjudication (1) "was contrary to federal law then clearly established in the holdings of" the Supreme Court; or (2) "involved an unreasonable application of" clearly established Supreme Court precedent; or (3) "was based on an unreasonable determination of the

facts in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "[T]his standard is difficult to meet . . . because it was meant to be." *Id.* at 102. Moreover, findings of fact made by the state court are presumed correct unless rebutted by clear and convincing evidence. § 2254(e)(1).

On appeal, this Court reviews "the district court's findings of fact for clear error and its conclusions of law de novo." *Dorsey v. Stephens*, 720 F.3d 309, 314 (5th Cir. 2013).

## II.    Green Is Not Entitled to a COA On His Claim of Alleged Intellectual Disability nor His Related Ineffective Assistance of Trial Counsel Claim. (Claim 1).

In the court below, Green asserted that he is ineligible for execution under *Atkins*, which precludes the execution of the intellectually disabled.[3] Green now seeks a COA on that claim arguing that the lower court improperly gave deference to the state courts' ultimate denial of relief and failed to "look through" to the court's reasoning in violation of the Supreme Court's recent ruling in *Wilson v. Sellers*, 138 S.Ct. 1188

---

[3]    In the lower court, the Director argued Green's *Atkins* claim was procedurally defaulted. ROA.3272-275. The lower court did not rule on the Director's claim. The Director does not believe that it is necessary to brief this issue at the present time but expressly is not waiving the default argument.

(2018). Brief at 34-44. Green also asserts a related IATC claim contending that counsel failed to investigate his alleged intellectual disability. Brief at 45-46. But neither claim is deserving of a COA.

Green has never proven the merits of his underlying intellectual disability claim. As the lower court cited, "At [Green's] capital murder trial, the defense's neuropsychologist, Dr. Martinez, testified on both direct and cross-examination that [Green] was not mentally retarded." ROA.4385. Green did not rebut this testimony during state habeas proceedings where he first alleged he was intellectually disabled. In fact, he presented "no evidence showing he has ever been diagnosed by a qualified mental health professional as intellectually disabled or referred for testing for intellectual disability." ROA.4386. Further, as the lower court held, Green "presented the state habeas court with no expert testimony or other evidence showing how the so-called Flynn effect might impact his IQ score." *Id*. Thus, the lower court concluded,

> There are valid reasons why the state habeas court could have found [Green's] claim of intellectual disability unpersuasive. [Green] offered the state habeas court an IQ test score (78), generated more than a year after [Green's] capital offense, which was outside the upper limit of the intellectually disabled range (75). While the lower end of the SEM for [Green's] IQ score (i.e., a range of 73-83) fell within the intellectually disabled range of 65-75, [Green] offered the

19

> state habeas court no mental health expert opinion suggesting [Green] is intellectually disabled. On the contrary, the only expert opinion properly before the state habeas court was Dr. Martinez's trial testimony that [Green] was not intellectually disabled.
>
> None of [Green's] defense team's mental health professionals who evaluated [Green] prior to trial concluded he was intellectually disabled. [Green] has never presented any court with any testimony from a qualified mental health professional suggesting [Green] is intellectually disabled. In fact, Dr. Agharkar, the neuropsychologist who evaluated [Green] in connection with [Green's] state habeas proceeding, testified he did not even evaluate [Green] for intellectual disability.

ROA.4387. The lower court also reviewed the record evidence of Green's alleged adaptive deficits. Specifically, the court noted, "[Green] argues the evidence before his state habeas court, particularly the testimony of his experts, Dr. Martinez and Dr. Agharkar, established that he suffered from deficits in social and interpersonal skills." ROA.4388. But the court concluded, "This Court's independent review of the record belies that assertion." *Id.* Green presents no record evidence to contradict the lower court's resolution of his intellectual disability claim. Indeed, Green has yet to present expert testimony supporting his alleged intellectual disability.

Green's assertions that the lower court erred under *Wilson* are also incorrect. *Wilson* held that a federal habeas court reviewing an unexplained state-court decision should "look through" that decision to the last related state-court decision that provides a relevant rationale and presume the unexplained decision adopted the same reasoning. 138 S.Ct. at 1193–97. Green argues that *Wilson* overruled this Court's precedent, which holds that a federal court's review under § 2254(d) of a state court denial of habeas relief focuses on whether the state court's ultimate conclusion was unreasonable "and not on whether the state court considered and discussed every angle of the evidence." *Langley v. Prince*, 890 F.3d 504, 515 (5th Cir. 2018), *reh'g granted*, 905 F.3d 924 (5th Cir. 2018); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). But *Wilson* did not abrogate this Court's ultimate-conclusion-not-reasoning methodology for reviewing state-court decisions under § 2254(d).

While *Wilson* suggests that the proper focus under § 2254(d) is the state-court opinion, it did not so hold. *Id.* at 1192 ("[If a state court issues a reasoned opinion,] a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they a reasonable."); *see also id.* at 1195 ("For one thing, *Richter*, did not directly

21

concern the issue before us—whether to 'look through' the silent state higher court opinion[.]"). Indeed, the Court explicitly described the issue before it, and it was not the methodology of § 2254(d) review—"The issue before us . . . concerns how a federal habeas court is to find the state court's reasons when the relevant state-court decision on the merits, say, a state supreme court decision, does not come accompanied with those reasons." *Id.* at 1192. Because *Wilson* was not deciding the proper methodology for review under § 2254(d), and because that portion of the opinion suggesting focus on state-court reasoning is obiter dictum, it does not abrogate this Court's ultimate-conclusion-not-reasoning precedent. *See Thomas v. Vannoy*, 893 F.3d 561, 568 (5th Cir. 2018) ("[T]he *Wilson* Court was only directly concerned with a state court order 'that was made without any explanatory opinion' whatsoever.").

Even if *Wilson* were read to abrogate the ultimate-conclusion-not-reasoning methodology, it is not clear it would apply to Texas postconviction review generally or to this case in particular. That is because, in denying Green's state habeas application, the CCA included the following language: "Therefore, based upon the trial court's findings and conclusions and our own review, we deny relief." ROA.10673. While

the CCA adopted the state habeas trial court's findings, the findings were not the only basis for the CCA's decision—it was also based on the CCA's "own review." *See Wilson*, 138 S. Ct. at 1203 (Gorsuch, J., dissenting) ("What if the state supreme court says something slightly different but to the same effect, declaring in each case that it has independently considered the relevant law and evidence before denying relief?"). Thus, it is not clear that *Wilson's* possible abrogation of this Court's ultimate-conclusion-not-reasoning methodology applies. In short, the CCA's decision is both reasoned (by adopting the findings) and unreasoned (by denying on its own review). Accordingly, *Richter's* "could have supported" standard of review still applies. *Richter*, 562 U.S. at 102.

Green's case is not one where the district court substituted its "thought as to more supportive reasoning" for the state court's decision. *Wilson*, 138 S. Ct. at 1197. Here, the state court provided multiple justifications for why Green's *Atkins* claim failed. ROA.9334-339. And the Supreme Court has explained that, if a state court provides multiple grounds for denying a claim, they must all be objectively unreasonable for an inmate to satisfy § 2254(d). *See, e.g., Parker v. Matthews*, 567 U.S. 37, 42 (2012) (per curiam); *Wetzel v. Lambert*, 565 U.S. 520, 525 (2012)

(per curiam). Thus, even if *Wilson* abrogated the ultimate-conclusion-not-reasoning methodology, it does not speak to a case, like here, where the state court provided multiple bases for denying a claim.

Finally, Green's assertion that the district court failed to conduct the appropriate review under § 2254(d) and *Wilson* because it did not scrutinize the state court's reasoning for rejecting his claim is incorrect. He argues that the lower court only considered whether the state court's ultimate conclusion was unreasonable. But the district court appropriately examined the state court's findings and the record and concluded the state court's rejection of the *Atkins* claim was reasonable. ROA.4385-89. Consequently, even assuming *Wilson* silently overruled Fifth Circuit precedent and mandated that federal courts focus their attention on the specific reasons provided by the state court for rejecting a petitioner's claim, Green provides no reason justifying this Court's attention because the lower court has already conducted an analysis consistent with *Wilson*.

Green's related IATC assertions regarding counsel's failure to investigate his alleged intellectual disability are also undeserving of a

COA. Brief at 45-46. Green raised this claim both in the court below and on state habeas review. ROA.1380-83; 9312 (2 SHCR 649 (#222)).

The familiar standard by which a claim of ineffective assistance of counsel is weighed is set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 687-88. In so doing, a convicted defendant must overcome a strong presumption that the conduct of his trial counsel fell within a wide range of reasonable professional assistance. *Id.* at 689; *Loyd v. Whitley*, 977 F.2d 149, 156 (5th Cir. 1992). "[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland,* 466 U.S. at 692. In order to establish that he has sustained prejudice, the convicted defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at 694; *Loyd*, 977 F.2d at 159. Because a convicted defendant must satisfy both prongs

of the *Strickland* test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. 466 U.S. at 697; *Black v. Collins*, 962 F.2d 394, 401 (5th Cir. 1992). Further, as the Supreme Court reminded, review of *Strickland* claims is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

The lower court does not address this related IATC claim but the state courts found that "[t]rial counsel was well aware of the significance of mental retardation in death penalty litigation and paid particular attention to this issue in investigating and developing [Green's] case." ROA.9313; 2 SHCR 650 (#227). But counsel "did not discover any evidence of mental retardation from their experts or from their mitigation investigation." *Id*. Green presents no new evidence much less clear and convincing evidence to overcome these findings.

Moreover, as the state courts found, Green "was examined by four mental health experts prior to trial:  Dr. Kelly Goodness, Dr. Gilbert Martinez, Dr. Kristi Compton, and Dr. David Self." ROA.9313; 2 SHCR 650 (#230). Despite the fact that all of these experts were qualified to make a diagnosis of mental retardation, "none of them did." *Id*. And, Dr. Martinez "affirmatively testified at trial, both on direct and cross-

examination, that [Green] is not mentally retarded." *Id.* Given the lack of evidence that Green suffers from intellectual disability, the state courts properly concluded that trial counsel were not ineffective. ROA.9314; 2 SHCR 651 (#232, 235); *see Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016).

Given Green's failure to demonstrate his alleged intellectual disability and the multiple mental health experts who evaluated him, Green cannot show that trial counsel was deficient or that he was prejudiced. These conclusions are not debatable among reasoned jurists and a COA should be denied.

## III. Green Is Not Entitled to a COA On His Claim That His Personal Mental Health Characteristics and Circumstances Exempt Him from Execution Under *Atkins*. (Claim 2).

In his second claim for relief, Green seeks relief under the Eighth Amendment's proportionality inquiry. Brief at 47-52. Green argues that because he suffers from psychosis and at the time of the offense was experiencing a "catathymic crisis," his sentence of death was unconstitutional. Green stresses that he is not claiming a categorical exception from the death penalty but rather an individual exception. Green admits he did not raise the same claim before the state courts.

Brief at 47. Thus, the Director argued in the court below that this claim was unexhausted and procedurally defaulted. ROA.3284-87. Again, the lower court did not rule on the default argument, but the Director wishes to preserve the issue. Nevertheless, the lower court properly denied habeas relief as Green's belief that *Atkins* extends to his personal circumstances is not supported by any law.

As the lower court observed, this Court has repeatedly rejected arguments that the Eighth Amendment bars states from executing those who are mentally ill. ROA.4390; *see, e.g., Smith v. Davis*, 927 F.3d 313, 339 (5th Cir. 2019) (rejecting the argument that the severely mentally ill lack sufficient moral culpability to permit a sentence of death); *Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017) (holding Fifth Circuit precedent forecloses the notion that the Eighth Amendment prohibits execution of the mentally ill); *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014) (denying a COA on a claim that the Eighth Amendment prohibits execution of the mentally ill); *In re Neville*, 440 F.3d 220,221 (5th Cir. 2006) (rejecting the argument that *Atkins* and *Roper*[4] created a new rule, making execution of the mentally ill unconstitutional). There

---

[4]    *Roper v. Simmons*, 543 U.S. 551 (2005).

is no clearly established law from the Supreme Court expanding its holding in *Atkins* to include all criminal defendants suffering from a diagnosable "mental illness." *Smith*, 927 F.3d at 339. Thus, the lower court properly concluded that

> The Texas Court of Criminal Appeals' rejections on the merits during [Green's] direct appeal and state habeas corpus proceedings of [Green's] Eighth Amendment challenges to the execution of the mentally ill were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [Green's] direct appeal or state habeas corpus proceeding.

ROA.4391. Green fails to provide any law that supersedes this determination. He also fails to show that jurists of reason would find this claim debatable. For these reasons, this Court must deny a COA.

## IV. Green Is Not Entitled to a COA On His Shackling Claim Because He Has Not and Cannot Prove Any Juror Saw Him in Shackles. He Is Also Not Entitled to a COA on His Related IATC Claim. (Claim 3).

Green asserts that because the jury saw him in shackles without a finding by the trial court that the shackles were necessary, fundamental error ensued. Brief at 53-62. Alternatively, Green also claims that trial counsel was ineffective for failing to object. *Id*. at 62-64. But, as explained

below, the lower court properly found that the state courts' denial "was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor did it result from a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [Green's] state habeas proceeding." ROA.4395. Green fails to show this determination is debatable among reasoned jurists. Therefore, his bid for a COA should be denied.[5]

First, despite Green's assertions that two jurors saw Green's shackles, there is little credible evidence to support Green's claim that the jury saw him shackled. Brief at 53. The lower court summarized the evidence before the state habeas court as follows:

> [Green's] lead trial counsel, Paul Johnson, testified during the state habeas corpus proceeding (1) "Sir, I can tell you that absolutely there's no possible way they saw him wearing leg restraints," (2) he believed the only way the jury could have seen [Green's] leg restraints was if the jurors were capable of seeing through the solid wood surrounding the front and sides of the defense bench, which went down to within an inch of the floor, and (3) it was impossible for the jury to have witnessed [Green] being brought into the courtroom because

---

[5]    The trial court failed to rule on the Director's assertion of a procedural bar in that shackling error requires an objection. ROA.3294-95. Again, the Director is not waiving this argument but does not believe it needs to be briefed in determining whether Green is entitled to a COA.

the jury was never in the jury box when [Green] was brought into the courtroom. Another of his trial counsel testified at the state habeas hearing that he made sure [Green's] leg restraints were not visible to the jury, and the bailiffs made sure [Green] was seated when the jury came in or out of the courtroom. [Green's] third trial attorney testified he did not believe it was possible for the jury to have seen [Green] wearing leg restraints because [Green] never walked in or out of the courtroom with the jury in the jury box.

Bailiff Tony Lancaster testified during [Green's] state habeas hearing that [Green] wore only leg shackles during trial, was not a special security threat, and was respectful and followed instructions. Lancaster testified [Green] sat approximately twenty to twenty-five feet from the jury box, the prosecution table was situated between the jury box and the defense table, and both tables were covered all the way to the floor in such a way as to obstruct the jury's view of the footwear worn by anyone at the defense table. Lancaster believed it was not possible for someone sitting in the jury box to see [Green's] feet. More importantly, Lancaster testified the jury was not present when [Green] walked into the courtroom, he sat down before the jury was brought into the courtroom, and [Green] did not leave the courtroom until the jury left the jury box. [Green] presented the testimony of two of his jurors who had furnished the state habeas court with affidavits stating they had seen [Green] in leg shackles during trial. One of the jurors testified that he saw [Green] in leg restraints once or twice during trial and he saw [Green] in restraints during the punishment phase of trial when [Green] was walking or standing, but he did not discuss the restraints with anyone during deliberations. The other juror testified that he did not recall actually seeing [Green] in restraints but saw that [Green] was not moving easily or comfortably and thought he was restrained.

ROA.4392-93 (footnote citations omitted). After hearing this testimony, the habeas court found the testimony of the jurors not credible. ROA.9331-32. This finding was adopted by the CCA. ROA.10672-73.

In accordance with AEDPA, the lower court noted that it was not permitted to reject the state courts' credibility determination on a cold paper record. ROA.4394. The court further determined that the state habeas court's determination that the jurors were not credible was reasonable in view of the testimony. ROA.4395. But, "[m]ore importantly, [Green] has failed to present this Court with clear and convincing evidence showing the state habeas court's credibility finding is erroneous." ROA.4395 (citing *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007); *and Rice v. Collins*, 546 U.S. 333, 338-39 (2006). Thus, the lower court concluded, "No evidence currently before this Court, much less any clear and convincing evidence, warrants second-guessing this express credibility finding." ROA.4395.

Green presents no evidence that overcomes these determinations. Instead, he continues to argue that the trial courts findings are erroneous and strain credibility. Brief at 53-55. Specifically, he argues that it is incredible that the trial judge knew there was a problem with shackling

in Dallas County but that everyone in the courtroom except the judge knew Green was shackled. *Id*. at 53. But Green overstates his case. The judge not being aware of Green's shackling supports the view that the shackles were not visible at any time. Green still lacks proof of his claim. Therefore, the lower court correctly deferred to the state courts' credibility determinations made after a live hearing and a COA is unwarranted.

Green argues in the alternative that his attorney was ineffective for failing to object. As Green did not raise an IATC claim regarding failure to object to Green's non-visible shackles on either direct appeal or on state collateral review, he has clearly failed to exhaust state court remedies. Thus, Green's related IATC claim is clearly defaulted. The lower court did not rule on either this IATC claim or the Director's procedural default argument. Again, the Director wishes to preserve the bar but does not believe it is necessary to brief now. Nevertheless, a COA should still be denied on this issue.

Green is aware his claim is subject to default but asserts that he can overcome the default based on *Martinez v. Ryan*, 132 S. Ct. 1309, 1318 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013). Brief at

64. But Green is again incorrect. As shown above, Green's claims are without merit, there is no way that he can make the "substantial" showing required by *Martinez* to demonstrate that he was prejudiced by trial counsel's alleged deficiencies. 132 S. Ct. at 1318-19. Further, if the shackles were not visible to the jury, trial counsel had no basis for an objection. It is settled that "failure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness . . . ." *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) (citing *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995)). Indeed, if counsel had objected to the non-visible shackling the trial court could have entered findings that supported the use of visible shackles and the court may have ordered the visible shackling of Green. Thus, trial counsel had a plausible strategic reason not to object. Finally, as summarized above, Green's attorneys all believed and testified at the state habeas hearing that the jurors could not and did not see Green in restraints.

Given Green's failure to prove the underlying merits of his shackling claim neither his due process or IATC claims are debatable among jurists of reason. Thus, a COA should be denied.

**V.    Green Is Not Entitled to a COA On His IATC Claims Regarding Counsel's Alleged Failures to Investigate, Develop and Litigate Issues of Green's Diminished Capacity and Abandonment Rage. (Claim 4).**

Green next seeks a COA on his allegations that trial counsel was ineffective for failing to investigate, develop, and litigate the issue of Green's diminished capacity and "abandonment rage." Brief at 65-72. Green believes such evidence could be used to negate the mens rea of capital murder. *Id*. Green argues that had trial counsel presented such evidence to the jury, he would not have been sentenced to death. The lower court rejected Green's contention that the claims had not been previously raised and found that Green has raised inadequate investigation claims on state habeas. ROA.4396. The court also found Green's new evidence, which is barred by *Cullen*, 563 U.S. at 181-82, to be unpersuasive. ROA.4410. Green again fails to demonstrate that this determination is debatable among reasoned jurists.

Green first argues that his claim was not previously raised but that it would not be barred because it *could* be a claim of a "newly recognized retroactive right." Brief at 65. Green fails to provide any legal support for his view but asks why he should be limited to clearly established federal law. *Id*. Unfortunately for Green, he is mistaken on both counts.

As the Director asserted and the lower court found, Green had previously raised IATC claims regarding a failure to investigate. ROA.3306-12, 4396. Green has no legal support for his belief that a new theory or category of evidence renders a previously raised failure to investigate claim new. Thus, all of Green's new evidence is barred by *Pinholster*, 563 U.S. at 182-83. Further, Green is limited to clearly established law by AEDPA. He may believe he is entitled to a new watershed rule of criminal procedure, but he must first obtain it from the Supreme Court. This he has not done.

## A.    Green's IATC claims regarding the guilt-innocence phase.

Reviewing the state court findings and the record, the lower court determined Green's IATC claims regarding the guilt-innocence phase were without merit. ROA.4404, 4411. First, the court noted that the state courts rejected Green's contentions of a "diminished capacity" defense because the only such defense is insanity which Green did not and could not raise. ROA.4401; Brief at 67. Noting it was bound by state law, the lower court properly denied this claim. ROA.4402. The court also found that there was no evidence during the state habeas proceeding that trial counsel were unreasonable in failing to present a diminished capacity

defense. ROA.4402-03. And, the lower court found there was no evidence

presented during state habeas proceedings that Green was prejudiced by

trial counsel's alleged deficiencies. ROA.4403. The court summarized the

testimony on this point as follows:

> As both Dr. Goodness and [Green's] lead trial counsel
> acknowledged, the evidence of [Green's] guilt was
> overwhelming. [Green's] confessions to the police, an
> emergency room physician, and Lovetta's sons were
> compelling and fully supported by the physical evidence.
> [Green's] letter explaining in advance his reasons for
> committing his offense and [Green's] calm, detached
> demeanor throughout his videotaped confession belie the
> assertion he was suffering from a form of diminished capacity
> recognized by Texas law at the time he committed his offense
> or when he later gave his confessions. [Green] recalled the
> details of his offense without difficulty, and even
> demonstrated for detective Quirk how he had stabbed
> Lovetta. The forensic evidence discovered during the
> autopsies of Lovetta and her daughter confirmed many of the
> details of [Green's] confession, even down to the exact number
> of stab wounds [Green] inflicted on Lovetta. During his
> confession, [Green] also recalled his conversations with
> Jerome and Jarrett the night of the murders in great detail --
> details both young men later confirmed during their trial
> testimony.

ROA.4403-04. Finally, the court held that Green had never presented

expert testimony that he suffered from a mental illness that rendered

him incapable of understanding the nature of his offense. ROA.4404.

For all these reasons, the lower court correctly denied relief on Green's IATC for failure to investigate during the guilt-innocence phase and a COA should be denied.

### B.    Green's IATC claims regarding the punishment phase.

Green's IATC claims regarding the punishment phase are also without merit. As the district court summarized, Green "argues in conclusory fashion that his trial counsel could have done a better and more convincing, job presenting the mitigating evidence the defense actually presented at trial, and should have further investigated and presented additional available mitigating evidence, including evidence showing he is intellectually disabled and suffers from low intellectual functioning and paranoid delusions." ROA.4404-05. But the lower court again found that the state courts had properly denied relief under both prongs of the *Strickland* standard. ROA.4405.

In reaching this conclusion the lower court summarized the findings of the state habeas court which concluded trial counsel made sound, well-investigated, strategic decisions regarding how to present evidence of Greens background and mental health at trial. ROA.4405-06. Thus, the lower concluded,

> Having independently reviewed the entirety of the record from [Green's] trial and state habeas proceedings, this Court concludes the Texas Court of Criminal Appeals' rejection on the merits of [Green's] ineffective assistance complaints regarding his trial counsels' performance at the punishment phase of trial was objectively reasonable. The Texas Court of Appeals' findings and conclusions regarding [Green's] ineffective assistance claims summarized above were likewise objectively reasonable given the evidentiary record before the state habeas court. The Texas Court of Criminal Appeals accurately concluded the "new" mitigating evidence presented by [Green] during his state habeas proceeding was largely duplicative of the mitigating evidence [Green's] trial counsel presented at trial.

ROA.4407. The lower court also reviewed the extensive record and found the state court's conclusions regarding a lack of prejudice to be a reasonable application of federal law. ROA. 4408-411. As the Court concluded,

> The prosecution presented an extremely strong case at the punishment phase of trial, including the grisly details of [Green's] capital offense, horrific testimony from [Green's] former sexual partners concerning his acts of violence toward them, testimony documenting [Green's] other felonies (including drug-dealing and an armed robbery of a grocery store in which he and a partner fired multiple shots inside the store), and graphic testimony regarding [Green's] attempts to kill Lovetta's two young sons the same evening he murdered her and her daughter. Given the evidence presented at trial, this Court independently concludes there is no reasonable probability the punishment phase of [Green's] capital murder trial would have ended any differently had [Green's] trial counsel undertaken any or all of the actions Petitioner now

complains should have been undertaken during his capital murder trial.

ROA.4410-11.

Green presents IATC claims firmly rejected by every court to review them. He fails to show that any reasoned jurist would disagree but rather attempts to portray his claim as a "watershed" rule in the making. But making a "watershed" rule from a basic claim of ineffective assistance of counsel claim is next to impossible. It is highly unlikely that Green can make this showing given the performance of his trial counsel and the horrific crimes he committed. But even if Green can make this showing, it is for the Supreme Court to decide. This Court is bound by the strictures of AEDPA. Given the extensive record of trial counsel's actions, the deference due the state court findings, and the thorough review of the lower court, Green cannot demonstrate he is entitled to a COA. Thus, one should be denied.

## VI.    The Lower Court Did Not Err in Denying Green's Various Funding Motions. (Claim 5).

Green initially sought $27,000 for investigative assistance for a new sub-claim from a larger claim of ineffective assistance of trial counsel that was raised and rejected during state habeas proceedings. ROA.33-55. The

lower court rejected Green's request. ROA.449-56. Green filed his federal habeas petition and the Director responded. And then Green sought $39,380 in federal funds to investigate the same claim. ROA.3342, 4258. The lower court also properly denied Green's motion for post-petition funding and his motion for rehearing. ROA.4283-91, 4327-35, 4354-57. Green seeks to appeal this issue. But Green should be required to seek a COA on this funding claim. Nevertheless, he fails to prove error regardless of the standard of review. A COA should be denied or the denial of funding affirmed.

This Court has a long history of not requiring COAs for expert services funding denials (which the Director understands binds the panel under the rule of orderliness, so the argument followed is raised for preservation purposes). *See, e.g.*, *Hill v. Johnson*, 210 F.3d 481, 487 n.2 (2000) (citing *Sterling v. Scott*, 57 F.3d 451, 454 n.3 (5th Cir. 1995)). Much of that history focuses on the fact that appointment-of-counsel issues do not require a COA and the statute that provides expert services funding also contains the federal habeas counsel appointment provision. *See id.* (citing *Sterling*, an appointment-of-counsel case, for the proposition that a "COA is not required for appeals" challenging the denial of expert

services funding). The same justification has been used more recently too. *See Ayestas v. Stephens*, 817 F.3d 888, 895 (5th Cir. 2016) (citing *Harbison v. Bell*, 556 U.S. 180 (2009), an appointment-of-counsel case, as justification for why a COA is not necessary to appeal a denial of expert services funding), *vacated sub nom. Ayestas v. Davis*, 138 S. Ct. 1080 (2018). But *Ayestas* itself calls into question whether a COA is required to appeal the denial of expert services funding. *See Ayestas*, 138 S. Ct. at n.1 ("Though we take no view on the merits, we will assume for the sake of argument that the Court of Appeals could not entertain petitioner's [18 U.S.C.] § 3599 claim without the issuance of a COA.").

It makes sense to not require a COA for appointment-of-counsel issues—they are entirely unrelated to the merits of a claim challenging the constitutionality of confinement. *See, e.g.*, *Harbison*, 556 U.S. at 183–84 (deciding whether an attorney appointed under § 3599 could also represent the petitioner in clemency proceedings). But that is not the case for funding denials. *See Ayestas*, 138 S. Ct. at 1094 ("Proper application of the 'reasonably necessary' standard thus requires courts to consider the potential merit of the claims that the applicant wants to pursue."); *Woodward v. Epps*, 580 F.3d 318, 333 (5th Cir. 2009) ("An appellate

court's consideration of the denial of [expert services] funding will often implicate the merits of a petitioner's habeas claim."). And because funding decisions implicate the merits of a claim, they should be subject to the COA standard.

Nevertheless, under this Circuit's precedent, funding decisions are reviewed for an abuse of discretion. *See Hill*, 210 F.3d at 487. "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Ebron*, 683 F.3d 105, 153 (5th Cir. 2012). When conducting such a review, the "underlying conclusions of law are reviewed de novo and conclusions of fact are reviewed for clear error." *Aguilar-Ayala v. Ruiz*, 972 F.2d 411, 416 (5th Cir. 1992).

If a petitioner can show that expert services are "'reasonably necessary,'" "a court 'may authorize the [petitioner's] attorneys to obtain such services on [his] behalf.'" *Ayestas*, 138 S. Ct. at 1092 (second alteration in original) (quoting § 3599(f)). "[D]istrict courts have *broad* discretion in assessing requests for funding." *Id.* at 1094 (emphasis added). Indeed, there "may even be cases in which it would be within a court's discretion to 'deny funds after a finding of reasonable necessity.'"

*Id.* "Proper application of the 'reasonably necessary' standard thus requires courts to consider [1] the potential merit of the claims that the applicant wants to pursue, [2] the likelihood that services will generate useful and admissible evidence, and [3] the prospect that the applicant will be able to clear any procedural hurdles standing in the way." *Id.* "[I]t would not be reasonable—in fact, it would be quite unreasonable—to think that services are necessary to the applicant's representation if, realistically speaking, they stand little hope of helping him win relief." *Id.* Further, if a petitioner is asking for more than the $7,500 presumptive cap on funds, he or she must also prove that they were "for services of an unusual character or duration." § 3599(g)(2). The district court's denial of expert services funding was not an abuse of discretion (and, alternatively, such is not debatable amongst reasonable jurists).

As noted above, the lower court denied Green's approximately $40,000 funding request—more than five times the presumptive cap—for mental health experts to develop an IATC mitigation claim. In denying Green's motions, the lower court noted that Green had raised IATC mitigation claims during state habeas proceedings and that Green's new evidence would be barred under *Pinholster*. ROA.4287. Alternatively,

accepting Green's view that these were new claims, the lower court found that Green did not demonstrate how the new claims would be procedurally viable. *Id*. Green fails to show how the lower court erred.

As discussed above, the lower court later found that Green's IATC claims regarding the mitigation investigation were raised on state habeas and that any new evidence was barred. ROA. 4396. Green fails to show this holding is incorrect. As the lower court stated, "Funding to create such evidence that could not be considered would be an improper 'misallocation of federal resources.'" ROA.4287 (citing *Devoe v. Davis*, *Devoe v. Davis*, 717 F. App'x 419, 431 (5th Cir. 2018)). A district court does not have to authorize funds to toil over well-plowed ground, let alone an amount more than five times the presumptive cap. *See Jones v. Davis*, 927 F.3d 365, 374 (5th Cir. 2019) (affirming the denial of funding because it "effectively s[ought] a full retrial of the issues already litigated in the state court").

Ultimately, Green sought funding to nitpick the mitigation investigation trial counsel and state habeas counsel conducted. But courts "must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel

present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000)). Despite his protestations, Green was "seeking to 'turn over every stone,' and § 3599 does not entitle him to do so." *Id.* (quoting *Ayestas*, 138 S. Ct. at 1094). "*Ayestas* did not disturb the long-settled principle that district courts have discretion to separate 'fishing expedition[s]' from requests for funding to support plausible defenses." *Jones*, 927 F.3d at 374. The district court did not abuse its broad discretion in denying Green more than five times more than the statutory limit on expert services funding.

Finally, Green argues that his "new" claims would not barred because under *Martinez* and *Trevino* he can overcome the procedural default. But in alleging that he can make a showing under *Martinez/Trevino*, Green fails to address the role of state habeas counsel. Green just asserts that counsel was also ineffective. This is despite the fact that state habeas counsel made the same arguments about trial counsel's effectiveness regarding the mitigation investigation, but, with different mental health issues. Thus, Green's claim has already been

investigated, formulated, and set forth in prior state court proceedings, and it is well settled, under both pre-AEDPA and post-AEDPA standards, that state prisoners in federal habeas review are not entitled to raise unexhausted claims or to further factually develop their partially exhausted claims in federal court. 28 U.S.C. § 2254 (b), (e); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 9 (1992); *Picard v. Connor*, 404 U.S. 270, 276-77 (1971); *Turner v. Johnson*, 106 F.3d 1178, 1183 (5th Cir. 1997); *Livingston v. Johnson*, 107 F.3d 297, 306 n. 7 (5th Cir. 1997).

Further, Green presents no authority to suggests that *Trevino*, overruled *Pinholster*, 563 U.S. at 181-82, Indeed, *Martinez* and *Trevino* only created a limited exception to the *Coleman* rule, holding specifically that [w]here, under State law, claims of ineffective assistance of trial counsel must be raised in an initial–review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial–review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective. *Martinez*, 132 S. Ct. at 1320. The result is that when a petitioner falls within this limited exception, a "procedural default will not bar a federal habeas court from hearing a substantial claim of

ineffective assistance at trial." *Id.* at 1320. In other words, the only remedy offered by *Martinez* is a federal merits review of the otherwise procedurally barred claim. *Trevino*, 133 S. Ct. at 1921. Because *Martinez* and *Trevino* say nothing about whether a defendant would be entitled to federal funding or evidentiary development to establish any inefficiencies of state habeas counsel, any further development is unwarranted.

In its limited holding the *Martinez* Court described the only consequence of a petitioner establishing cause and prejudice for a procedural default: "A finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 132 S. Ct. at 1320. Nowhere in either opinion did the Court mention funding or 18 U.S.C. § 3599. Nor did the Court hold that the limited equitable exception created somehow now required such investigative funding or altered the mechanism for evaluating whether such funds were reasonably necessary. For this reason, this Circuit concluded that *Martinez* "does not mandate pre–petition funding, nor does it alter our rule that a prisoner cannot show a substantial need for

funds when his claim is procedurally barred from review." *Crutsinger v. Stephens*, 576 F. App'x 422, 431 (5th Cir. 2014).

As set out above, Green did not demonstrate that he was entitled to additional funding. He does not show the lower court erred in determining the additional funding was not "reasonably necessary." For these reasons, this Court should deny a COA or alternatively affirm the lower court's ruling.

## CONCLUSION

Green does not show that reasonable jurists would debate the resolution of the issues, nor does he show that any of them deserve additional consideration. His COA request should therefore be denied. He has also failed to demonstrate the lower court abused its discretion in denying his multiple motions for funding. The appeal of those claims should be denied.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

MARK PENLEY
Deputy Attorney General for

Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

s/ Ellen Stewart-Klein
ELLEN STEWART-KLEIN
Assistant Attorney General
State Bar No. 24028011
*Counsel of Record*

OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
Post Office Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.:(512) 936-1400
Fax:(512) 936-1280
Email:*Ellen.Stewart-Klein@oag.texas.gov*
*Attorneys for Respondent–Appellee*

**CERTIFICATE OF SERVICE**

I do hereby certify that on March 13, 2020, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorney of record, who consented in writing to accept this notice as service of this document by electronic means:

Michael Mowla
P.O. Box 868
Cedar Hill, Texas 75106

s/ Ellen Stewart-Klein
ELLEN STEWART-KLEIN
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 10,989 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 MSO, 14 points, Century Schoolbook.

s/ Ellen Stewart-Klein
ELLEN STEWART-KLEIN
Assistant Attorney General

## ELECTRONIC CASE FILING CERTIFICATIONS

I do hereby certify that: (1) all required privacy redactions have been made; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus scanning program and is free of viruses.

s/ Ellen Stewart-Klein
ELLEN STEWART-KLEIN
Assistant Attorney General
